**CHRISTIAN LOUBOUTIN S.A. et al., Plaintiffs,**

v.

**YVES SAINT LAURENT AMERICA, INC. et al., Defendants.**

**No. 11 Civ. 2381(VM).**

United States District Court, S.D. New York.

Aug. 10, 2011.

---

Harley Irwin Lewin, McCarter & English, LLP, New York, NY, Lee Carl Bromberg, McCarter & English, LLP, Boston, MA, for Plaintiffs.

David H. Bernstein, Jyotin Hamid, Jill Van Berg, Rayna S. Feldman, Debevoise & Plimpton, LLP, New York, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin individually (collectively, "Louboutin") brought this action against Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc., Yves Saint Laurent S.A.S., Yves Saint Laurent, John and Jane Does A–Z and unidentified XYZ Companies 1–10 (collectively, "YSL"), asserting various claims under the Lanham Act, 15 U.S.C. § 1051 et seq. and New York law. YSL's opposition asserts various counterclaims seeking cancellation of Louboutin's trademark registration and damages. Louboutin now moves under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction. For the reasons discussed below, Louboutin's motion is DENIED.

## I. BACKGROUND[1]

Sometime around 1992 designer Christian Louboutin had a bright idea. He began coloring glossy vivid red the outsoles of his high fashion women's shoes. Whether inspired by a stroke of original genius or, as competitor YSL retorts, copied from King Louis XIV's red-heeled dancing shoes, or Dorothy's famous ruby slippers in "The Wizard of Oz," or other styles long available in the contemporary market—including those sold by YSL Christian Louboutin deviated from industry custom. In his own words, this diversion was meant to give his line of shoes "energy," a purpose for which he chose a shade of red because he regarded it as "engaging, flirtatious, memorable and the color of passion," as well as "sexy." (Mourot Decl. Ex. C (Docket No. 22–7) ¶ 3; id. (Docket No. 22–12) at 4.) In pursuit of the red sole's virtues, Louboutin invested substantial amounts of capital building a reputation and good will, as well as promoting and protecting Louboutin's claim to exclusive ownership of the mark as its signature in women's high fashion footwear.

Over the years, the high fashion industry responded. Christian Louboutin's bold divergence from the worn path paid its dividends. Louboutin succeeded to the point where, in the high-stakes commercial

---

1. The factual summary below is derived from the following documents: Plaintiff's Amended Memorandum of Law in Support of Application for a Preliminary Injunction, dated June 21, 2011, and any exhibits and declarations attached thereto; Defendants/Counterclaim-Plaintiffs' Memorandum of Law in Opposition to Motion for Preliminary Injunction, dated July 12, 2011, and any exhibits and declarations attached thereto; and Plaintiff's Reply Memorandum of Law in Support of Application for a Preliminary Injunction, dated July 19, 2011, and any exhibits and declarations attached thereto. The Court will make no further citations to these sources unless otherwise specified.

markets and social circles in which these things matter a great deal, the red outsole became closely associated with Louboutin. Leading designers have said it, including YSL, however begrudgingly. Film stars and other A-list notables equally pay homage, at prices that for some styles command as much as $1,000 a pair. And even at that expense, a respectable niche of consumers wears the brand, to the tune of about 240,000 pairs a year sold in the United States, with revenues of approximately $135 million projected for 2011. When Hollywood starlets cross red carpets and high fashion models strut down runways, and heads turn and eyes drop to the celebrities' feet, lacquered red outsoles on high-heeled, black shoes flaunt a glamorous statement that pops out at once. For those in the know, cognitive bulbs instantly flash to associate: "Louboutin." This recognition is acknowledged, for instance, at least by a clientele of the well-heeled, in the words of a lyrical stylist of modern times:

> Boy, watch me walk it out ... Walk this right up out the house I'm throwin' on my Louboutins ... [2]

And as an equally marked sign of Louboutin's success, competitors and black market infringers, while denying any offense, mimic and market its red sole fashion.

No doubt, then, Christian Louboutin broke ground and made inroads in a narrow market. He departed from longstanding conventions and norms of his industry, transforming the staid black or beige bottom of a shoe into a red brand with worldwide recognition at the high end of women's wear, a product visually so eccentric and striking that it is easily perceived and remembered.

The law, like the marketplace, applauds innovators. It rewards the trend-setters, the market-makers, the path-finding non-conformists who march to the beat of their own drums. To foster such creativity, statutes and common law rules accord to inspired pioneers various means of recompense and incentives. Through grants of patents and trademark registrations, the law protects ingenuity and penalizes unfair competition. In this case, the United States Patent and Trademark Office ("PTO"), perhaps swayed in part by the widespread recognition the red sole had already attained, invested Louboutin's brand with legal distinction in 2008 by approving registration of the mark. The issue now before the Court is whether, despite Christian Louboutin's acknowledged innovation and the broad association of the high fashion red outsole with him as its source, trademark protection should not have been granted to that registration.

The PTO awarded a trademark with Registration No. 3,361,597 (the "Red Sole Mark") to Louboutin on January 1, 2008. The certificate of registration includes both a verbal description of the mark and a line drawing intended to show placement of the mark as indicated below:

The verbal description reads:

FOR: WOMEN'S HIGH FASHION DESIGNER FOOTWEAR, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 0–0–1992; IN COMMERCE 0–0–1992.

2. Jennifer Lopez, Louboutins (Epic Records 2009).

THE COLOR(S) RED IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF A LACQUERED RED SOLE ON FOOTWEAR. THE DOTTED LINES ARE NOT PART OF THE MARK BUT ARE INTENDED ONLY TO SHOW PLACEMENT OF THE MARK.

(Mourot Decl. Ex. A (Docket No. 22–1).)

Louboutin approached YSL in January 2011 to discuss several models of shoes offered by YSL that Louboutin claims use the same or a confusingly similar shade of red as that protected by the Red Sole Mark. YSL, a fashion house founded in 1962, produces seasonal collections that include footwear. According to YSL, red outsoles have appeared occasionally in YSL collections dating back to the 1970s. Louboutin takes issue with four shoes from YSL's Cruise[3] 2011 collection: the Tribute, Tribtoo, Palais and Woodstock models. Each of the challenged models bears a bright red outsole as part of a monochromatic design in which the shoe is entirely red (or entirely blue, or entirely yellow, etc.). An all-red version of the Tribute previously appeared in YSL's Cruise 2008 collection.

After YSL refused to withdraw the challenged models from the market, Louboutin filed this action asserting claims under the Lanham Act for (1) trademark infringement and counterfeiting, (2) false designation of origin and unfair competition and (3) trademark dilution, as well as state law claims for (4) trademark infringement, (5) trademark dilution, (6) unfair competition and (7) unlawful deceptive acts and practices. In response, YSL asserted counterclaims seeking (1) cancellation of the Red Sole Mark on the grounds that it is (a) not distinctive, (b) ornamental, (c) functional, and (d) was secured by fraud on the PTO, as well as (2) damages for (a) tortious interference with business relations and (b) unfair competition.

Louboutin now seeks a preliminary injunction preventing YSL from marketing during the pendency of this action any shoes that use the same or a confusingly similar shade of red as that protected by the Red Sole Mark. Hence, this case poses a Whitmanesque question. Paraphrased for adaptation to the heuristics of the law, it could be framed like this. A lawyer said *What is the red on the outsole of a woman's shoe?* and fetching it to court with full hands asks the judge to rule it is

> [A] gift and remembrancer designedly dropt, Bearing the owner's name someway in the corners, that we may see and remark, and say *Whose?*[4]

Because in the fashion industry color serves ornamental and aesthetic functions vital to robust competition, the Court finds that Louboutin is unlikely to be able to prove that its red outsole brand is entitled to trademark protection, even if it has gained enough public recognition in the market to have acquired secondary meaning. The Court therefore concludes that Louboutin has not established a likelihood that it will succeed on its claims that YSL

---

**3.** "Cruise" in this context refers to the fashion season between winter and spring, which is sold in stores beginning in November of each year. (Vaissié Decl. (Docket No. 34) ¶ 11.)

**4.** Walt Whitman, *Leaves of Grass* 195 (Karen Karbiener ed., 2004). The text from which this passage derives (italics in the original) reads:

> A child said *What is the grass ?* fetching it to me with full hands
>
> . . . .
>
> . . . I guess it is the handkerchief of the Lord, A scented gift and remembrancer designedly dropt, Bearing the owner's name someway in the corners, that we may see and remark and say *Whose ?*

infringed the Red Sole Mark to warrant the relief that it seeks.

## II. DISCUSSION

■ To obtain a preliminary injunction, Louboutin must establish "(1) irreparable harm *and* (2) *either* (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its favor]." *Monserrate v. N.Y. State Senate,* 599 F.3d 148, 154 (2d Cir.2010) (emphasis added); *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 242 (2d Cir.2009).

## A. TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER THE LANHAM ACT

To succeed on its claims for trademark infringement and unfair competition under the Lanham Act, Louboutin must demonstrate that (1) its Red Sole Mark merits protection and (2) YSL's use of the same or a sufficiently similar mark is likely to cause consumer confusion as to the origin or sponsorship of YSL's shoes. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 114 (2d Cir.2009); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 115 (2d Cir.2006).

The first question, therefore, is whether Louboutin's Red Sole Mark merits protection. The Lanham Act permits the registration of a "trademark," which it defines as

> any word, name, symbol, or device, or any combination thereof ... [,] which a person has a bona fide intention to use in commerce and applies to register ..., to identify and distinguish his or her goods ... from those manufactured and sold by others and to indicate the source of the goods.

15 U.S.C. § 1127. Louboutin's certificate of registration of the Red Sole Mark gives rise to a statutory presumption that the mark is valid. *See* 15 U.S.C. § 1057(b); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir. 1999). However, that presumption of validity may be rebutted. *See Lane Capital Mgmt.,* 192 F.3d at 345.

■ Color alone "*sometimes*" may be protectable as a trademark, "where that color has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand (and thus indicates its 'source')." *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 161, 163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (emphasis added); *Louis Vuitton Malletier,* 454 F.3d at 115. Conversely, color may not be protectable where it is "functional," meaning that the color is essential to the use or purpose of the product, or affects the cost or quality of the product. *Qualitex,* 514 U.S. at 165, 115 S.Ct. 1300. In short, color can meet the legal requirements for a trademark if it "act[s] as a symbol that distinguishes a firm's goods and identifies their source, *without serving any other significant function.*" *Id.* at 166, 115 S.Ct. 1300 (emphasis added). As defined in the Restatement (Third) of Unfair Competition, a design is functional if its "aesthetic value" is able to "confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs." *Id.* at 170, 115 S.Ct. 1300 (*quoting Restatement (Third) of Unfair Competition* § 17 cmt. c (1993)).

Applying these principles, courts have approved the use of a single color as a trademark for industrial products. *See, e.g., id.* at 160, 115 S.Ct. 1300 (green-gold for pads used on dry cleaning presses); *In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1123 (Fed.Cir.1985) (pink for fibrous glass insulation). In some indus-

trial markets the design, shape and general composition of the goods are relatively uniform, so as to conform to industry-wide standards. Steel bolts, fiber glass wall insulation and cleaning press pads, for example, are what they are regardless of which manufacturer produces them. The application of color to the product can be isolated to a single purpose: to change the article's external appearance so as to distinguish one source from another.

But, whatever commercial purposes may support extending trademark protection to a single color for industrial goods do not easily fit the unique characteristics and needs—the creativity, aesthetics, taste, and seasonal change—that define production of articles of fashion. That distinction may be readily visualized through an image of the incongruity presented by use of color in other industries in contrast to fashion. Can one imagine industrial models sashaying down the runways in displays of the designs and shades of the season's collections of wall insulation? The difference for Lanham Act purposes, as elaborated below, is that in fashion markets color serves not solely to identify sponsorship or source, but is used in designs primarily to advance expressive, ornamental and aesthetic purposes.

In the fashion industry, the Lanham Act has been upheld to permit the registration of the use of color in a trademark, but only in distinct patterns or combinations of shades that manifest a conscious effort to design a uniquely identifiable mark embedded in the goods. See, e.g., Louis Vuitton Malletier, 454 F.3d at 116 ("LV" monogram combined in a pattern of rows with 33 bright colors); Burberry Ltd. v. Euro Moda, Inc., No. 08 Civ. 5781, 2009 WL 1675080, at *5 (S.D.N.Y. June 10, 2009) (registered Burberry check pattern entitled to statutory presumption of validity). In these cases the courts clearly point out that the approved trademark applies to color not as an abstract concept, or to a specific single shade, but to the arrangement of different colors and thus their synergy to create a distinct recognizable image purposely intended to identify a source while at the same time serving as an expressive, ornamental or decorative concept.

The narrow question presented here is whether the Lanham Act extends protection to a trademark composed of a single color used as an expressive and defining quality of an article of wear produced in the fashion industry. In other words, the Court must decide whether there is something unique about the fashion world that militates against extending trademark protection to a single color, although such registrations have sometimes been upheld in other industries.

To answer this question, and recognizing the fanciful business from which this lawsuit arises, the Court begins with a fanciful hypothetical. Suppose that Monet, having just painted his water lilies, encounters a legal challenge from Picasso, who seeks by injunction to bar display or sale of those works. In his complaint, Picasso alleges that Monet, in depicting the color of water, used a distinctive indigo that Picasso claims was the same or too close to the exquisite shade that Picasso declares is "the color of melancholy," the hallmark of his Blue Period, and is the one Picasso applied in his images of water in paintings of that collection. By virtue of his long-standing prior use of that unique tinge of blue in context, affirmed by its registration by the trademark office, Picasso asserts exclusive ownership of the specific tone to portray that color of water in canvas painting. Should a court grant Picasso relief?

Putting aside the thousand technicalities lawyers would conjure and quibble about in arguing why the imagined case is inap-

posite or distinguishable from the real controversy before the Court, the example contains some analytic parallels perhaps helpful in resolving this actual dispute.

Painting and fashion design stem from related creative stock, and thus share many central features. Both find common ground and goals in two vital fields of human endeavor, art and commerce. For the ultimate ends they serve in these spheres, both integrally depend on creativity. Fashion designers and painters both regard themselves, and others regard them, as being engaged in labors for which artistic talent, as well as personal expression as a means to channel it, are vital. Moreover, the items generated by both painters and fashion designers acquire commercial value as they gain recognition. Louboutin himself would probably feel his sense of *honneur* wounded if he were considered merely a cobbler, rather than an *artiste*. But, as a matter differing only in degrees and order of priority, Louboutin and Picasso both may also be properly labeled as men of commerce, each in his particular market.

The creative energies of painter and fashion designer are devoted to appeal to the same sense in the beholder and wearer: aesthetics. Both strive to please patrons and markets by creating objects that not only serve a commercial purpose but also possess ornamental beauty (subjectively perceived and defined). Quintessentially, both painting and fashion embrace matters of taste. In consequence, they share vicissitudes natural to any matter of palate or palette. They change as the seasons change. Styles, features, whole lines come and go with passing likes and dislikes, to be replaced by new articles with origins from regions where genius charts a different course. Items fall in and out of fashion in all nuances of the word, conveying not only currency but seasonality and transience. Perhaps capturing something of that relative inconstancy, painting and fashion share a vocabulary. They speak in ethereal terms like fanciful, inventive, eccentric, whimsical, visionary, and, to quote Louboutin again, "engaging, flirtatious" (Mourot Decl. Ex. C (Docket No. 22–7) ¶ 3)—all words which also have in common an aim to evoke and affect things of the moment.

These creative means also share a dependence on color as an indispensable medium. Color constitutes a critical attribute of the goods each form designs. Alone, in combinations, in harmonious or even incongruous blends, in varying patterns and shapes, the whole spectrum of light serves as a primal ingredient without which neither painting nor fashion design as expressive and ornamental art would flourish. For, color depicts elemental properties. As it projects expression of the artist's mental world, it captures the mutability, the fancy, the moods of the visual world, in both spheres working as a means to execute singular concepts born of imagination for which not just any other shade will do. Hence, color in this context plays a unique role. It is a feature purposely given to an article of art or design to depict the idea as the creator conceived it, and to evoke an effect intended. In ornamenting, it draws attention to itself, and to the object for which its tone forms a distinct expressive feature. From these perspectives, color in turn elementally performs a creative function; it aims to please or be useful, not to identify and advertise a commercial source.

But, as an offshoot of color, perhaps most crucial among the features painting and fashion design share as commerce and art, are two interrelated qualities that both creative fields depend upon to thrive, and indeed to survive: artistic freedom and fair competition. In both forms, the great-

est range for creative outlet exists with its highest, most vibrant and all-encompassing energies where every pigment of the spectrum is freely available for the creator to apply, where every painter and designer in producing artful works enjoys equal freedom to pick and choose color from every streak of the rainbow. The contrary also holds. Placing off limit signs on any given chromatic band by allowing one artist or designer to appropriate an entire shade and hang an ambiguous threatening cloud over a swath of other neighboring hues, thus delimiting zones where other imaginations may not veer or wander, would unduly hinder not just commerce and competition, but art as well.

The thrust and implications of the Court's analogy are clear. No one would argue that a painter should be barred from employing a color intended to convey a basic concept because another painter, while using that shade as an expressive feature of a similar work, also staked out a claim to it as a trademark in that context. If as a principle this proposition holds as applied to high art, it should extend with equal force to high fashion. The law should not countenance restraints that would interfere with creativity and stifle competition by one designer, while granting another a monopoly invested with the right to exclude use of an ornamental or functional medium necessary for freest and most productive artistic expression by all engaged in the same enterprise.

■ The question of whether the use of a single color in the fashion industry can constitute a valid mark necessarily raises another one: whether a single color may be "functional" in that context. "The functionality doctrine ... forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality.' " *Qualitex,* 514 U.S. at 169, 115 S.Ct. 1300 (*quoting Inwood Labs., Inc. v. Ives,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Use of a single color has been held functional, and therefore not protectable under the Lanham Act, in other contexts. *See, e.g., Brunswick Corp. v. British Seagull Ltd.,* 35 F.3d 1527, 1533 (Fed.Cir.1994) (black for marine outboard engines held functional because it is "compatib[le] with a wide variety of boat colors and [can] make objects appear smaller"); *Deere & Co. v. Farmhand, Inc.,* 560 F.Supp. 85, 98 (S.D.Iowa 1982) (green for farm equipment held functional because farmers "prefer to match their loaders to their tractor"), *aff'd,* 721 F.2d 253 (8th Cir.1983). These cases illustrate the principle that "[a]esthetic appeal *can* be functional; often we value products for their looks." *Eco Mfg. LLC v. Honeywell Int'l Inc.,* 357 F.3d 649, 653 (7th Cir.2003) (emphasis in original).

■ Christian Louboutin himself has acknowledged significant, nontrademark functions for choosing red for his outsoles. As already quoted above, he stated that he chose the color to give his shoe styles "energy" and because it is "engaging." (Mourot Decl. Ex. C (Docket No. 22–7) ¶ 3.) He has also said that red is "sexy" and "attracts men to the women who wear my shoes." (*Id.;* Mourot Decl. Ex. C (Docket No. 22–12) at 4.) YSL, for its part, has used red to evoke Chinese design elements. For the Cruise 2011 collection, YSL employed the monochromatic style that it indicates is part of the brand's history, meaning that each of the challenged shoe models is entirely red. The shoes also coordinate with clothing items offered in the same collection. Color serves an additional significant nontrademark function: "to satisfy the 'noble instinct for giving the right touch of beauty

to common and necessary things.'" *Qualitex,* 514 U.S. at 170, 115 S.Ct. 1300 (*quoting* G. Chesterton, *Simplicity and Tolstoy* 61 (1912)). The outsole of a shoe is, almost literally, a pedestrian thing. Yet, coated in a bright and unexpected color, the outsole becomes decorative, an object of beauty. To attract, to reference, to stand out, to blend in, to beautify, to endow with sex appeal—all comprise non-trademark functions of color in fashion.

The red outsole also affects the cost of the shoe, although perhaps not in the way *Qualitex* envisioned. Arguably, adding the red lacquered finish to a plain raw leather sole is more expensive, not less, than producing shoes otherwise identical but without that extra ornamental finish. (*See* Mourot Decl. Ex. C (Docket No. 22–7) ¶ 3.) Yet, for high fashion designers such as Louboutin and YSL, the higher cost of production is desirable because it makes the final creation that much more exclusive, and costly.

Because the use of red outsoles serves nontrademark functions other than as a source identifier, and affects the cost and quality of the shoe, the Court must examine whether granting trademark rights for Louboutin's use of the color red as a brand would "significantly hinder competition," that is, "permit one competitor (or a group) to interfere with legitimate (non-trademark-related) competition through actual or potential exclusive use of an important product ingredient." *Qualitex,* 514 U.S. at 170, 115 S.Ct. 1300. Here, Christian Louboutin singularly claimed "the color red" as a feature of the mark, and he registered a "lacquered red sole" for "women's high fashion designer footwear." (Mourot Decl. Ex. A (Docket No. 22–1).) Both components of the mark pose serious legal concerns as well as threats to legitimate competition in the designer shoe market.

■ Louboutin's claim to "the color red" is, without some limitation, overly broad and inconsistent with the scheme of trademark registration established by the Lanham Act. Awarding one participant in the designer shoe market a monopoly on the color red would impermissibly hinder competition among other participants. YSL has various reasons for seeking to use red on its outsoles—for example, to reference traditional Chinese lacquer ware, to create a monochromatic shoe, and to create a cohesive look consisting of color-coordinating shoes and garments. Presumably, if Louboutin were to succeed on its claim of trademark infringement, YSL and other designers would be prohibited from achieving those stylistic goals. In this respect, Louboutin's ownership claim to a red outsole would hinder competition not only in high fashion shoes, but potentially in the markets for other women's wear articles as well. Designers of dresses, coats, bags, hats and gloves who may conceive a red shade for those articles with matching monochromatic shoes would face the shadow or reality of litigation in choosing bands of red to give expression to their ideas.

The effects of this specter—the uncertainty and apprehension it generates—are especially acute in the fashion industry because of its grounding on the creative elements discussed above. Fashion is dependent on colors. It is subject to temporal change. It is susceptible to taste, to idiosyncrasies and whims and moods, both of designers and consumers. Thus, at any moment when the market and the deities of design, by whatever fancy they decide those things, proclaim that "passion" is in for a given season and must be expressed in reds in the year's various collections, Louboutin's claim would cast a red cloud over the whole industry, cramping what other designers could do, while allowing Louboutin to paint with a full palette.

Louboutin would thus be able to market a total outfit in his red, while other designers would not. And this impediment would apply not just with respect to Louboutin's registered "the color red," but, on its theory as pressed in this litigation, to a broader band of various other shades of red which would be available to Louboutin but which it could bar others from using.

■ Louboutin asserts that it is the color depicted in the registration's drawing, and not the verbal reference to the "color red," that controls. In its reply brief, Louboutin identified that color for the first time as Pantone No. 18–1663 TP, or "Chinese Red," part of the PANTONE TEXTILE color system.[5] Yet that identification raises additional issues. Louboutin cannot amend or augment its PTO registration by representations it makes in this litigation. Accordingly, the color that governs here remains, as Louboutin points out, the shade of red depicted in the registration's drawing. As Louboutin concedes, however, because of varying absorption and reflection qualities of the material to which it is applied, a color as it manifests on paper would appear quite different—some lighter, some darker hues—on other mediums such as leather and cloth. A competitor examining the Louboutin registration drawing for guidance as to what color it applies to may therefore remain unable to determine precisely which shade or shades it encompasses and which others are available for it to safely use.

Moreover, YSL has represented to the Court that the precise color of the styles Louboutin challenges is not Chinese Red, and that YSL has never used Pantone No. 18–1663 TP on its outsoles. Undaunted, Louboutin insists that YSL has nonetheless infringed the Red Sole Mark because its challenged shoe models use a shade confusingly too close to Chinese Red. Yet Louboutin cannot provide a satisfactory explanation as to why those models—but not others previously made by YSL that also bear a red outsole—are confusingly similar to its claimed mark. The larger question this conflict poses is how close to a protected single color used in an item of fashion can the next competitor approach without encountering legal challenge from the first claimant of a shade as a trademark.

In response to this legal dilemma, Louboutin proposes that the Court simply draw a designated range both above and below the borderlines of Pantone No. 18–1663 TP, and declare all other stripes of red within that zone forbidden to competitors. Its suggested metric references *Olay Co., Inc. v. Cococare Prods., Inc.* *See* 218 U.S.P.Q. 1028, 1045 (S.D.N.Y.1983) (issuing injunction requiring infringer to use "a discernibly different pink, at least 40% different in terms of [Pantone Matching System] tones" from that used by registrant). Louboutin's proposal would have the effect of appropriating more than a dozen shades of red-and perhaps other colors as well [6]—

<hr>

5. The TEXTILE color system assists designers in selecting and specifying color to be used in the manufacture of textiles and apparel. In 2003, the TEXTILE color system was replaced with the FASHION + HOME color system, and the suffix of each color was changed from "TP" to "TPX."

6. Louboutin's suggestion that the Court require other designers to stay some percentage away from Chinese Red raises the question: some percentage of what? Chinese Red, like

any color, is made up of a certain combination of other colors. Based on the Court's research, this combination can be expressed in various metrics, such as a combination of RGB (red, green, blue) or CMYK (cyan, magenta, yellow, black), or HSB (hue, saturation, brightness). *See* Mark Galer & Les Horvat, *Digital Imaging: Essential Skills* 3–5, 7 (3d ed.2005). In Adobe Color Picker, *see id.* at 6, a variance of just 10 percent in any of these inputs, in either direction, yields more

and goes far beyond the injunction upon which Louboutin relies. In *Olay*, the protectable interest was not "in the color pink alone," but rather in the color in combination with graphics and packaging. *See id.* Here, Louboutin's claimed mark is, in essence, the color red alone when used on the soles of "high fashion" footwear. (Mourot Decl. Ex. A (Docket No. 22–1).) Moreover, although Louboutin attempts in these proceedings to limit the scope of the mark to high-*heeled* footwear, no such limitation appears on the face of the registration. (*See id.*)

The other options Louboutin's claim would leave other competitors are no more practical or palatable. As YSL endeavored to do during a deposition of Christian Louboutin in connection with this action, other designers could seek advance clearance from Christian Louboutin himself, spreading the fan of shades before him to see at what tint his red light changes to amber.[7] Or they could go to court and ask for declaratory relief holding that a proposed red sole is not close enough to Chinese Red to infringe Louboutin's mark, thereby turning the judge into an arbiter of fashion design. Though *Qualitex* points out that in trademark disputes courts routinely are called upon to decide difficult questions involving shades of differences in words or phrases or symbols, the commercial contexts in which the application of those judgments generally has arisen has not entailed use of a single color in the fashion industry, where distinctions in designs and ideas conveyed by single colors represent not just matters of degree but much finer qualitative and aesthetic calls.

Because Louboutin's registration specifies that it covers women's high fashion "designer footwear," the description is broad enough to encompass all styles of shoes, not just the high-heeled model illustrated in the PTO registration. Louboutin's argument that it would not pursue a claim of infringement based upon red outsoles on, for example, flat shoes, wedges or kitten heels, is cold comfort to competing designers. In fact, in one case in Paris, Louboutin sought to enforce its French trademark for a "shoe sole in the color red" against the company Zara France, S.A.R.I., which is not a high-end retailer. (*See* Hamid Decl. Ex. G (Docket No. 32–2).)

■ Another dimension of uncertainty the Red Sole Mark creates pertains to its coating. Louboutin's claim extends not just to the base of "the color red," but also to its gloss. In the registration, it is described more specifically as "lacquered" red. Thus, it is not clear, for example, whether the protection of Louboutin's trademark would apply to a "Chinese Red" outsole that was not shiny, but entirely flat. In fact, that issue has surfaced in this case. YSL asserts that the color tone of some of the shoes Louboutin challenges is not lacquered at all but a flat red. By bringing this litigation, Louboutin is of course calling upon the Court to pass judgment as well on the degree of buffing that a competitor may give to a Chinese Red outsole before it begins to infringe on Louboutin's rights.

than a dozen shades visibly different from Chinese Red, in some cases so different as to appear to the casual observer pink on one side of Chinese Red or orange on the other.

7. In response to YSL's inquiry as to whether a particular YSL shoe infringes the Red Sole Mark, Christian Louboutin responded at his deposition that he "will think about it." (Hamid Decl. Ex. A (Docket No. 32–1) at 60:11–14.) In response to YSL's inquiry as to whether Christian Louboutin would "object to *any* shade of red on a sole," counsel for Christian Louboutin instructed him not to answer. (*Id.* at 46:4–18 (emphasis added).)

Finally, conferring legal recognition on Louboutin's claim raises the specter of fashion wars. If Louboutin owns Chinese Red for the outsole of high fashion women's shoes, another designer can just as well stake out a claim for exclusive use of another shade of red, or indeed even Louboutin's color, for the insole, while yet another could, like the world colonizers of eras past dividing conquered territories and markets, plant its flag on the entire heel for its Chinese Red. And who is to stop YSL, which declares it pioneered the monochrome shoe design, from trumping the whole footwear design industry by asserting rights to the single color shoe concept in all shades? And these imperial color wars in women's high fashion footwear would represent only the opening forays. What about hostile color grabs in the markets for low-fashion shoes? Or for sports shoes? Or expanding beyond footwear, what about inner linings, collars, or buttons on coats, jackets, or dresses in both women's and men's apparel?

In sum, the Court cannot conceive that the Lanham Act could serve as the source of the broad spectrum of absurdities that would follow recognition of a trademark for the use of a single color for fashion items. Because the Court has serious doubts that Louboutin possesses a protectable mark, the Court finds that Louboutin cannot establish a likelihood that it will succeed on its claims for trademark infringement and unfair competition under the Lanham Act. Thus there is no warrant to grant injunctive relief on those claims.

### B. *OTHER CLAIMS*

Louboutin also seeks preliminary injunctive relief on its claims for (1) trademark infringement under state law; (2) trademark dilution under federal and state law; and (3) unfair competition under state law. None of these claims can succeed absent a protectable mark. *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581–82 (2d Cir.1990) (trademark infringement under state law); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F.Supp.2d 535, 552 (S.D.N.Y.2003) (trademark dilution under federal and state law); *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, —— F.Supp.2d ——, ——, Nos. 10 Civ. 3314, 10 Civ. 5013, 2011 WL 2078227, at *3 (S.D.N.Y. May 25, 2011) (unfair competition under state law).[8] Because Louboutin cannot demonstrate a sufficient likelihood that its Red Sole Mark merits protection, the Court need not consider whether YSL's allegedly infringing shoes are likely to cause consumer confusion, nor whether Louboutin is likely to suffer irreparable harm absent an injunction.

### C. *COUNTERCLAIMS*

YSL has asserted counterclaims for cancellation of the Red Sole Mark and for damages. If a motion for summary judgment were brought, the Court's conclusion that the Red Sole Mark is ornamental and functional in its fashion industry market would compel it to grant partial summary judgment in favor of YSL on YSL's counterclaims seeking cancellation of Louboutin's mark. However, no motion for summary judgment is before the Court, and discovery has not formally closed. Conse-

---

8. The Court notes that Louboutin's claim for unlawful deceptive acts and practices, although not a basis for its motion for a preliminary injunction, similarly would fail in this context. *See R.D. Corp. v. Jewelex New York Ltd.*, 784 F.Supp.2d 441, 448–50, No. 07 Civ. 13, 2011 WL 1742111, at *5 (S.D.N.Y. May 4, 2011) (dismissing claim for unlawful deceptive acts and practices under New York General Business Law § 349 because it arose out of a dispute between competitors involving trademark infringement).

quently, Louboutin is entitled to certain "procedural safeguards" before the Court may sua sponte dispose of its claims. *See First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir.1999). While, in the Court's view, the ample record developed in connection with the preliminary injunction briefing obviates the need for further discovery, the parties must be provided notice and a reasonable time to respond before the Court may consider whether judgment as a matter of law is warranted. *See* Fed.R.Civ.P. 56(f).

Summary judgment as to YSL's counterclaims for cancellation of the mark would not dispose of the entire case, because YSL's counterclaims for tortious interference with business relations and unfair competition would remain. Nevertheless, the Court recognizes that the validity of Louboutin's Red Sole Mark is the heart of this litigation, and following the final resolution of that issue in this forum would be the most appropriate time for Louboutin to take an appeal to the United States Court of Appeals for the Second Circuit. *See* Fed.R.Civ.P. 54(b); *see, e.g., Mech. Plastics v. Titan Techs., Inc.*, 823 F.Supp. 1137, 1151 (S.D.N.Y.1993).

## III. *ORDER*

For the reasons stated above, it is hereby **ORDERED** that the motion (Docket No. 17) of plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin individually (collectively, "Louboutin") for a preliminary injunction is DENIED; and it is further

**ORDERED** that counsel for all parties are directed to appear for a case management conference on August 17, 2011 at 2:00 p.m., at which Louboutin shall show cause why the record of this action as it now exists should not be converted into a motion for partial summary judgment cancelling Louboutin's trademark at issue here for the reasons stated in the Court's decision above.

**SO ORDERED.**