11-3303-cv
*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 24, 2012                    Decided: September 5, 2012 )

Docket No. 11-3303-cv

_____

CHRISTIAN LOUBOUTIN S.A., CHRISTIAN LOUBOUTIN, L.L.C., CHRISTIAN LOUBOUTIN,

*Plaintiffs-Counter-Defendants-Appellants*,


v.


YVES SAINT LAURENT AMERICA HOLDING, INC., YVES SAINT LAURENT S.A.S., YVES
SAINT LAURENT AMERICA, INC.,

*Defendants-Counter-Claimants-Appellees*,

YVES SAINT LAURENT, (an unincorporated association), JOHN DOES, A TO Z, (Unidentified), JANE
DOES, A TO Z, (Unidentified), XYZ COMPANIES, 1 TO 10, (Unidentified),

*Defendants-Appellees*.

_____

Before: CABRANES, STRAUB, and LIVINGSTON, *Circuit Judges*.

Fashion designer Christian Louboutin brings this appeal from an August 10, 2011 order of the

United States District Court for the Southern District of New York (Victor Marrero, *Judge*) denying a

motion for a preliminary injunction against alleged trademark infringement by Yves Saint Laurent, a

competing fashion house ("YSL").  The District Court found that Louboutin's trademark was likely not

enforceable and declined to enter a preliminary injunction against YSL's use of the trademark.

1

We conclude that the District Court's holding that a single color can never serve as a trademark in the fashion industry, *Christian Louboutin S.A. v. Yves Saint Laurent Am., Inc.*, 778 F. Supp. 2d 445, 451, 457 (S.D.N.Y. 2011), is inconsistent with the Supreme Court's decision in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162 (1995), and that the District Court therefore erred by resting its denial of Louboutin's preliminary injunction motion on that ground. We further conclude that Louboutin's trademark, consisting of a red, lacquered outsole on a high fashion woman's shoe, has acquired limited "secondary meaning" as a distinctive symbol that identifies the Louboutin brand. As explained below, pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119 we limit the trademark to uses in which the red outsole contrasts with the color of the remainder of the shoe. We conclude that the trademark, as thus modified, is entitled to trademark protection. Because Louboutin sought to enjoin YSL from using a red sole as part of a *monochrome* red shoe, we affirm in part the order of the District Court insofar as it declined to enjoin the use of red lacquered outsoles in all situations. However, we reverse in part the order of the District Court insofar as it purported to deny trademark protection to Louboutin's use of *contrasting* red lacquered outsoles. We enter judgment accordingly, and we remand for further proceedings with regard to YSL's counterclaims.

Affirmed in part, reversed in part, and remanded.

> HARLEY I. LEWIN (Lee Carl Bromberg and Charles D. Ray, *on the brief*), McCarter & English, LLP, New York, NY, Boston, MA, Hartford, CT, *for Plaintiffs-Counter-Defendants-Appellants Christian Louboutin S.A., Christian Louboutin, L.L.C., Christian Louboutin.*

> DAVID H. BERNSTEIN (Jyotin Hamid and Rayna S. Feldman, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Defendants-Counter-Claimants-Appellees Yves Saint Laurent America Holding, Inc., Yves Saint Laurent S.A.S., and Yves Saint Laurent America, Inc., and Defendants-Appellees Yves Saint Laurent, (an unincorporated association), John Does, A to Z, (Unidentified), Jane Does, A to Z, (Unidentified), XYZ Companies, (Unidentified).*

Janet L. Cullum (John W. Crittenden, Cooley LLP, San Francisco, CA, and Susan J.
  Hightower, Pirkey Barber LLP, Austin, TX, *on the brief*), Cooley LLP, New York,
  NY, *for amicus curiae International Trademark Association, in support of Plaintiffs-
  Counter-Defendants-Appellants.*

Richard Z. Lehv (Jason D. Jones *on the brief*), Fross Zelnick Lehrman & Zissu, P.C.,
  New York, NY, *for amici curiae Tiffany (NJ) LLC and Tiffany & Co., in support of
  Plaintiffs-Counter-Defendants-Appellants.*

Rebecca Tushnet, Professor of Law, Georgetown University Law Center, Washington,
  D.C., *on the brief, for amici curiae Professors of Law in Trademark and Related Fields, in
  support of Defendants-Counter-Claimants-Appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether a single color may serve as a legally protected trademark in the fashion industry and, in particular, as the mark for a particular style of high fashion women's footwear. Christian Louboutin, a designer of high-fashion women's footwear and accessories, has since 1992 painted the "outsoles" of his women's high-heeled shoes with a high-gloss red lacquer. In 2008, he registered the red lacquered outsole as a trademark with the United States Patent and Trade Office ("PTO").[1] We are asked to decide whether that mark is protectable under federal trademark law.

Louboutin, Christian Louboutin S.A., and Christian Louboutin, L.L.C. (jointly, "Louboutin"), bring this interlocutory appeal from an August 10, 2011 order of the United States District Court for the Southern District of New York (Victor Marrero, *Judge*) denying a motion for a preliminary injunction against alleged trademark infringement by Yves Saint Laurent America Holding, Inc., Yves Saint Laurent S.A.S., and Yves Saint Laurent America, Inc. (jointly, "YSL"). The District Court, in addressing a difficult and novel issue of trademark law, held that, because a single color can never be

---

[1] Specifically, the registration for the Louboutin mark states: "The color(s) red is/are claimed as a feature of the mark. The mark consists of a lacquered red sole on footwear." Joint App'x 294 (capitalization altered).

protected by trademark in the fashion industry, Louboutin's trademark was likely not enforceable. It therefore declined to enter a preliminary injunction to restrain YSL's alleged use of the mark.

We conclude that the District Court's holding that a single color can never serve as a trademark in the fashion industry, *Christian Louboutin S.A. v. Yves Saint Laurent America, Inc.*, 778 F. Supp. 2d 445, 451, 457 (S.D.N.Y. 2011) ("*Louboutin*"), is inconsistent with the Supreme Court's decision in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162 (1995) ("*Qualitex*"), and that the District Court therefore erred by resting its denial of Louboutin's preliminary injunction motion on that ground. We further conclude that Louboutin's trademark, which covers the red, lacquered outsole of a woman's high fashion shoe, has acquired limited "secondary meaning" as a distinctive symbol that identifies the Louboutin brand. As explained below, pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, we limit the trademark to uses in which the red outsole contrasts with the remainder of the shoe (known as the "upper"). We conclude that the trademark, as thus modified, is entitled to trademark protection. Finally, we conclude that, because the monochrome design employed by YSL is not a use of Louboutin's modified trademark, we need not, and indeed should not, address whether YSL's use of a red outsole risks consumer confusion or whether the Louboutin mark, as modified, is "functional."

We therefore (1) affirm in part the order of the District Court, insofar as it declined to enjoin the use of all red lacquered outsoles; (2) reverse in part the order of the District Court insofar as it purported to deny trademark protection to Louboutin's use of *contrasting* red lacquered outsoles; and (3) enter judgment accordingly. We remand for further proceedings with regard to YSL's counterclaims.

4

# BACKGROUND[2]

This appeal arises out of an action for injunctive relief and enforcement of a trademark brought by Louboutin, together with the corporate entities that constitute his eponymous French fashion house, against YSL, a venerable French fashion institution. Louboutin is best known for his emphasis upon the otherwise-largely-ignored outsole of the shoe. Since their development in 1992, Louboutin's shoes have been characterized by their most striking feature: a bright, lacquered red outsole, which nearly always contrasts sharply with the color of the rest of the shoe.

Christian Louboutin introduced his signature footwear to the fashion market in 1992. Since then, his shoes have grown in popularity, appearing regularly on various celebrities and fashion icons. The District Court concluded, and YSL does not dispute, that "Louboutin [had] invested substantial amounts of capital building a reputation and good will, as well as promoting and protecting Louboutin's claim to exclusive ownership of the mark as its signature in women's high fashion footwear." *Louboutin*, 778 F. Supp. 2d at 447. The District Court further found that Louboutin had succeeded in promoting his shoes "to the point where, in the high-stakes commercial markets and social circles in which these things matter a great deal, the red outsole became closely associated with Louboutin. Leading designers have said it, including YSL, however begrudgingly." *Id.* at 447–48. As a result of Louboutin's marketing efforts, the District Court found, the "flash of a red sole" is today "instantly" recognizable, to "those in the know," as Louboutin's handiwork. *Id.* at 448.

---

[2] Because the District Court did not hold an evidentiary hearing prior to issuing its ruling on the preliminary injunction, the facts in this section are principally drawn from the uncontested facts asserted by the plaintiff to the District Court and to us, as well as the facts found by the District Court in its opinion. *See Lopez Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 172 (2d Cir. 2006) (drawing conclusions of law based upon facts found by the district court during a preliminary injunction proceeding), *rev'd on other grounds*, 552 U.S. 196 (2008).

5

On the strength of the fashion world's asserted recognition of the red sole, Louboutin on March 27, 2007 filed an application with the PTO to protect his mark (the "Red Sole Mark" or the "Mark"). The trademark was granted in January 2008, and stated: "The color(s) red is/are claimed as a feature of the mark. The mark consists of a lacquered red sole on footwear." *Id.* at 449 (capitalization altered). The written description was accompanied by a diagram indicating the placement of the color:



In 2011, YSL prepared to market a line of "monochrome" shoes in purple, green, yellow, and red. YSL shoes in the monochrome style feature the same color on the entire shoe, so that the red version is all red, including a red insole, heel, upper, and outsole. This was not the first time that YSL had designed a monochrome footwear line, or even a line of footwear with red soles; indeed, YSL maintains that since the 1970s it had sold such shoes in red and other colors.

In January 2011, Louboutin avers, his fashion house learned that YSL was marketing and selling a monochrome red shoe with a red sole. Louboutin requested the removal of the allegedly infringing shoes from the market, and Louboutin and YSL briefly entered into negotiations in order to avert litigation.

The negotiations having failed, Louboutin filed this action on April 7, 2011, asserting claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, for (1) trademark infringement and counterfeiting, (2) false designation of origin and unfair competition, and (3) trademark dilution, as well as state law claims for (4) trademark infringement, (5) trademark dilution, (6) unfair competition, and (7) unlawful deceptive acts and practices. Louboutin also sought a preliminary injunction preventing YSL from marketing, during the pendency of the action, any shoes, including red monochrome shoes, bearing

6

outsoles in a shade of red identical to the Red Sole Mark, or in any shade which so resembles the Red Sole Mark as to cause confusion among consumers.

In response, YSL asserted two counterclaims: (1) seeking cancellation of the Red Sole Mark on the grounds that (a) it is not "distinctive,"[3] but instead merely "ornamental,"[4] (b) it is "functional,"[5] and (c) it was secured by fraud on the PTO; and (2) seeking damages for (a) tortious interference with business relations and (b) unfair competition. On July 22, 2011, after a limited and expedited discovery process, the parties argued the preliminary injunction motion. As noted above, *see* note 2, *ante*, the District Court did not hold an evidentiary hearing.

On August 10, 2011, the District Court issued a Decision and Order denying the injunction and holding that the Louboutin fashion house had not shown a likelihood of success on the merits of its claims. As the District Court saw it, the "narrow question" presented by the case was "whether the Lanham Act extends protection to a trademark composed of a single color used as an expressive and defining quality of an article of wear produced in the fashion industry"—that is, "whether there is something unique about the fashion world that militates against extending trademark protection to a single color." *Louboutin*, 778 F. Supp. 2d at 451.

---

[3] *See* Part IV.A, *post*.

[4] An ornamental feature is one that "do[es] not serve a purpose" in the design of a product. *See TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 35 (2001); *see also Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 916 F.2d 76, 80 (2d Cir. 1990) (holding that "the features at issue are strictly ornamental because they neither affect the use of the [product] nor contribute to its efficient manufacture").

[5] "'[I]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, n.10 (1982). For a full discussion of the doctrines of functionality and, more specifically, "aesthetic functionality," see Part III, *post*.

7

Interpreting the Supreme Court's holding in *Qualitex*, the District Court explained that color is protectable as a trademark only if it "'acts as a symbol that distinguishes a firm's goods and identifies their source, *without serving any other significant function*.'" *Id.* at 450 (quoting *Qualitex*, 514 U.S. at 166) (alteration omitted). The District Court further observed, albeit without citation to authority, that "whatever commercial purposes may support extending trademark protection to a single color for industrial goods do not easily fit the unique characteristics and needs—the creativity, aesthetics, taste, and seasonal change—that define production of articles of fashion." *Id.* at 451. For that reason, the District Court held that, in the fashion industry, single-color marks are inherently "functional" and that any such registered trademark would likely be held invalid. *Id.* at 457. The Court therefore held that Louboutin was unlikely to be able to prove that the Red Sole Mark was eligible for trademark protection, and denied Louboutin's motion for a preliminary injunction.[6] *Id.* at 449–50, 457. This appeal followed.

On appeal, Louboutin argues that the District Court erred in (1) holding, based on the doctrine of "aesthetic functionality," that the Red Sole Mark was not entitled to legal protection; (2) applying the doctrine of aesthetic functionality to hold that a single color on a fashion item could not act as a trademark; (3) failing to give weight to the statutory presumption of validity deriving from the Red Sole Mark's registration; (4) applying an improper analysis of trademark infringement and dilution; (5) ignoring allegedly undisputed proof of likelihood of confusion and irreparable harm; and

---

[6] The District Court also issued an order to show cause why "the record of this action as it now exists should not be converted into a motion for partial summary judgment cancelling Louboutin's trademark at issue here for the reasons stated in the Court's decision above." *Louboutin*, 778 F. Supp. 2d at 458. Nine days later, the Court stayed the entire case pending the resolution of this appeal. *Christian Louboutin S.A. v. Yves Saint Laurent Am., Inc.*, No. 11-cv-2381 (VM), Docket Entry 60 (S.D.N.Y. Aug. 19, 2011).

8

(6) announcing a *per se* rule of functionality in a manner that violated Federal Rule of Civil Procedure 52.[7]

## DISCUSSION

### I.        Standard of Review

The District Court may grant a preliminary injunction if the moving party establishes "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (internal quotation marks omitted). We review the denial of a preliminary injunction for "abuse of discretion." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011); *cf. Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining that the term of art "abuse of discretion" includes errors of law).

We address the District Court's order in three parts. We first consider whether a single color is protectable as a trademark, both generally and in the specific context of the fashion industry. We then address the doctrine of "aesthetic functionality" and consider whether, as the District Court held, a single-color mark is necessarily "functional" in the context of the fashion industry—with the result that no such mark could ever be trademarked in that industry. Finally, we determine whether the Red Sole Mark is a valid trademark entitled to the protection of the Lanham Act.

---

[7] Federal Rule of Civil Procedure 52(a)(2) requires that "[i]n granting or refusing an interlocutory injunction, the court must . . . state [separately] the findings [of fact] and conclusions [of law] that support its action." Louboutin asserts that the District Court failed to make findings of fact as required by that rule, and announced a new *per se* legal rule rather than merely entering conclusions of law.

## II. Trademark Protection of Single-Color Marks

We begin by briefly recalling what trademark law is—and what it is not.

The principal purpose of federal trademark law is to "secure the public's interest in protection against deceit as to the sources of its purchases, [and] the businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name." *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir. 1995) (internal quotation mark omitted) (alteration in the original).

> [T]rademark law, by preventing others from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

*Qualitex*, 514 U.S. at 163–64 (internal quotation marks, citation, and alteration omitted). In accordance with these purposes of the Lanham Act, the law provides the owner of a mark with the "enforceable right to exclude others from using [the mark]." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974).

Nevertheless, trademark law is *not* intended to "protect[ ] innovation by giving the innovator a *monopoly*" over a useful product feature. *Fabrication Enters., Inc.*, 64 F.3d at 59 n.4 (emphasis added); *see Nora Beverages, Inc. v. Perrier Grp. of Am.*, 269 F.3d 114, 120 n.4 (noting that trademark law should not be used to "inhibit[ ] legitimate competition by giving monopoly control to a producer over a useful product"). Such a monopoly is the realm of patent law or copyright law, which seek to encourage

10

innovation, and not of trademark law, which seeks to preserve a "vigorously competitive market" for the benefit of consumers.[8] *Yurman Design, Inc.*, 262 F.3d at 115 (internal quotation marks omitted).

## A. The Analytical Framework

We analyze trademark infringement claims in two stages.

"First, we look to see whether plaintiff's mark merits protection." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006). In order for a trademark to be protectable, the mark must be "distinctive" and not "generic." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997). A mark is said to be "inherently" distinctive if "[its] intrinsic nature serves to identify a particular source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).[9] Even a mark that is not inherently distinctive may nonetheless "acquire" distinctiveness by developing "secondary meaning" in the public mind. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). A mark has acquired "secondary meaning" when, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.*[10]

---

[8] *See Fabrication Enters., Inc.*, 64 F.3d at 59 n.4 ("The Lanham Act is not concerned with protecting innovation by giving the innovator a monopoly, which is the function of patent law."); *cf. Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 421 n.1 (2d Cir. 1985) (Newman, J., dissenting) ("Any concern that copyright protection may accord a monopoly to advances in functional design is adequately met by confining the scope of copyright protection to the precise expression of the proprietor's design." (citation omitted)).

[9] Although *Two Pesos*, and several of the other cases we rely upon, discuss unregistered trade dress rather than a registered trademark, the infringement analysis is the same. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000) (noting with approval instances in which courts analyzed distinctiveness with regard to trade dress by analogy to the law of registered trademarks); *Louis Vuitton Malletier*, 454 F.3d at 115 (noting that the "same analysis [used in claims of trade dress infringement] applies to claims of trademark infringement under § 32"); *Fabrication Enters., Inc.*, 64 F.3d at 57 n.2 (noting that the distinction between defendant's counterclaims of trade dress and trademark infringement was "immaterial . . . because functionality . . . is a defense in both trademark and trade dress cases").

[10] "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*, protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence, *see id.*, that the mark is ineligible for protection. *See* 15 U.S.C. § 1115(a) (a party seeking to invalidate a registration must prove the existence of a

Second, if (and only if) the plaintiff's trademark is "distinctive" within the meaning of trademark law and is therefore valid and protectable, we must then determine "whether [the] defendant's use of a similar mark is likely to cause consumer confusion." *Louis Vuitton Malletier*, 454 F.3d at 115. In this second stage, if a markholder has successfully demonstrated that its mark is valid and that the competitor's mark is likely to cause confusion, "the competitor can [nevertheless] prevail . . . by showing that the [mark] is functional"—a traditional defense to the enforcement of a trademark. *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 974 (2d Cir. 1987) ("*Stormy Clime*"), *disapproved on other grounds by Two Pesos*, 505 U.S. at 773. The "functionality" of a mark can be demonstrated by, *inter alia*, showing that the mark has either traditional "utilitarian" functionality or "aesthetic" functionality. *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 212 (D. Conn. 2004); *see* Section III, *post*.

With this traditional (if somewhat mechanical) taxonomy in mind, we turn to the history of single-color trademarks.

## B. A Brief History of Single-Color Marks

Prior to the adoption of our modern statutory trademark scheme in the Lanham Act of 1946, 15 U.S.C. § 1051 *et seq.*, the status of single-color trademarks rested on uncertain ground. *See generally In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1118–19 (Fed. Cir. 1985) ("*Owens-Corning*"). Although as early as 1906 the Supreme Court had expressed a Delphic and suitably ambiguous skepticism that single-color marks could be registered as trademarks, *see A. Leschen & Sons Rope Co. v. Broderick & Bascom Rope Co.*, 201 U.S. 166, 171 (1906) (observing that "[w]hether mere color can constitute a valid trade-mark may admit of doubt"), other courts occasionally employed common law unfair competition

"legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered").

12

principles to protect the use of color as a distinguishing product feature. *See, e.g., Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co.*, 147 F.2d 407, 415 (6th Cir. 1945) (holding that the user of a mark was "entitled to protection in its long established use of the color yellow on its taxicabs . . . , inasmuch as it has acquired a good will by use of the yellow color scheme on taxicabs by virtue of appropriate application of the doctrine of secondary meaning"). Although courts did not go so far as to hold that single-color marks could merit trademark protection, the recognition by some courts that color standing alone can, in some circumstances, acquire secondary meaning was an important building block in the evolution of single-color marks.

After the passage of the Lanham Act, which codified "in the broadest of terms" the "universe" of things eligible for trademark protection, *Qualitex*, 514 U.S. at 162, courts "gradually . . . rejected the *dictum* [of earlier cases] . . . to the effect that color alone is not subject to trademark [protection]," *Owens-Corning*, 774 F.2d at 1122, and owners of color-related marks began to enjoy a degree of enforcement success. *See, e.g., Application of Hehr Mfg. Co.*, 279 F.2d 526, 528 (C.C.P.A. 1960) (holding that a square red label intended for use on automobile trailer windows was eligible for trademark registration); *Artus Corp. v. Nordic Co.*, 512 F. Supp. 1184, 1190 (W.D. Pa. 1981) (protecting plaintiff's arbitrary color scheme for metal spacers). Nevertheless, the issue of single-color mark registration lay largely dormant until 1985, when the United States Court of Appeals for the Federal Circuit decided *Owens-Corning*.

Faced with the question of whether a fiberglass manufacturer could trademark the pink color of its residential insulation material, the Federal Circuit in *Owens-Corning* began by recounting the evolution of color as a product-source designator. In language that continues to hold force today, the Court observed that jurisprudence under the Lanham Act had "developed in accordance with the statutory

13

principle that if a mark is capable of being or becoming distinctive of [the] applicant's goods in commerce, then it is capable of serving as a trademark." *Owens-Corning*, 774 F.2d at 1120. Noting that "[Owens-Corning's] use of the color 'pink' performs no non-trademark function, and is consistent with the commercial and public purposes of trademarks," the Court concluded that the use "serves the classical trademark function of indicating the origin of the goods, and thereby protects the public." *Id.* at 1123. On that basis, the Court held that Owens-Corning was "entitled to register its mark." *Id.* at 1128.

## C. Single-Color Marks Today

The question of whether a color can be protected as a trademark or trade dress was finally resolved in 1995 by the Supreme Court's decision in *Qualitex*, which involved a claim for trade dress protection of the green-gold color of a dry cleaning press pad. The question presented was "whether the [Lanham Act] permits the registration of a trademark that consists, purely and simply, of a color." *Qualitex*, 514 U.S. at 160–61 (citation omitted). Reversing a decision of the Ninth Circuit that had declared color *per se* ineligible for trademark protection, the Court observed that "it is difficult to find, in basic trademark objectives, a reason to disqualify absolutely the use of a color as a mark." *Id.* at 164. The Court held, among other things, that it could find no "principled objection to the use of color as a mark in the important 'functionality' doctrine of trademark law." *Id.* It concluded that "color alone, *at least sometimes*, can meet the basic legal requirements for use as a trademark. It can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function." *Id.* at 166 (emphasis added).

### III. The "Functionality" Defense

As the Supreme Court observed in *Qualitex*, aspects of a product that are "functional" generally "cannot serve as a trademark." *Id.* at 165 (internal quotation mark omitted). We have observed that "[t]he doctrine of functionality prevents trademark law from inhibiting legitimate competition by giving monopoly control to a producer over a useful product." *Nora Beverages, Inc.*, 269 F.3d at 120 n.4; *see Genesee Brewing Co.*, 124 F.3d at 145 n.5 (it is a "fundamental principle of trademark law that a trademark . . . does not grant a monopoly of production"). This is so because functional features can be protected only through the patent system, which grants a limited monopoly over such features until they are released into general use (typically after either 14 or 20 years, depending on the type of patent). *See Fabrication Enters., Inc.*, 64 F.3d at 58–59 & n.4 ("The Lanham Act is not concerned with protecting innovation by giving the innovator a monopoly, which is the function of patent law."); *Stormy Clime*, 809 F.2d at 977–78 ("Courts must proceed with caution in assessing claims to unregistered trademark protection in the design of products so as not to undermine the objectives of the patent laws. . . . Since trademark protection extends for an unlimited period, expansive trade dress protection for the design of products would prevent some functional products from enriching the public domain.").

As noted above, two forms of the functionality doctrine are relevant to us today: "traditional" or "utilitarian" functionality, and "aesthetic" functionality. Both forms serve as an affirmative defense to a trademark infringement claim.

## A. "Traditional" or "Utilitarian" Functionality

According to our traditional understanding of functionality, a product feature is considered to be "functional" in a utilitarian sense[11] if it is (1) "essential to the use or purpose of the article," or if it (2) "affects the cost or quality of the article." *Inwood Labs.*, 456 U.S. at 850 n.10.[12] A feature is essential "'if [it] is dictated by the functions to be performed'" by the article. *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir. 1983)).[13] It affects the cost or quality of the article where it "'permits the article to be manufactured at a lower cost'" or "'constitutes an improvement in the operation of the goods.'"[14] *Id.* (quoting *Warner Bros., Inc.*, 724 F.2d at 331). A finding that a product feature is functional according to the *Inwood* test will ordinarily render the feature ineligible for trademark protection.

## B. "Aesthetic Functionality"

Generally, "[w]here [a product's] design is functional under the *Inwood* formulation there is no need to proceed further." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001)

---

[11] *See Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 80 (2d Cir. 1990) (noting that the term "functionality" as commonly understood seems to imply "only utilitarian considerations").

[12] An issue on appeal in *Inwood* was whether the color of a name-brand prescription pill was functional, and therefore available for use by manufacturers of the drug's generic equivalent, because the color assisted pharmacists in dispensing the correct prescription. *See Inwood*, 456 U.S. at 847, 849–51; *but see id.* at 857 n.20 (declining to rule on the functionality of the color).

[13] In *LeSportsac*, K Mart challenged the trade dress of a backpack composed of "parachute nylon and trimmed in cotton carpet tape with matching cotton-webbing straps. The zippers used to open and close the bags [we]re color coordinated with the bags themselves, and usually [we]re pulled with hollow rectangular metal sliders." *LeSportsac*, 754 F.2d at 74.

[14] In *Warner Brothers*, we cited as examples *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122 (1938), in which the pillow shape of a shredded wheat biscuit was deemed functional because the cost of the cereal would be increased and its quality lessened by any other form, and *Fisher Stoves Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980), in which a two-tier woodstove design was deemed functional because it improved the operation of the stove. *See Warner Bros., Inc.*, 724 F.2d at 331.

16

("*TrafFix*").  Nevertheless, as the Supreme Court had held in 1995 in *Qualitex*, when the aesthetic design of a product is *itself* the mark for which protection is sought, we may also deem the mark functional if giving the markholder the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage," *Qualitex*, 514 U.S. at 165.  This remains true even if there is "no indication that [the mark has] any bearing on the use or purpose of the product or its cost or quality." *TrafFix*, 532 U.S. at 33; *see Landscape Forms, Inc. v. Colum. Cascade Co.*, 70 F.3d 251, 253 (2d Cir. 1995) (when evaluating design trademarks we consider whether "certain features of the design are essential to effective competition in [the] particular market").

As set forth below, the test for aesthetic functionality is threefold:  At the start, we address the two prongs of the *Inwood* test, asking whether the design feature is either "essential to the use or purpose" or "affects the cost or quality" of the product at issue.  Next, if necessary, we turn to a third prong, which is the competition inquiry set forth in *Qualitex*.  In other words, if a design feature would, from a traditional utilitarian perspective, be considered "essential to the use or purpose" of the article, or to affect its cost or quality, then the design feature is functional under *Inwood* and our inquiry ends.[15] But if the design feature is not "functional" from a traditional perspective, it must still pass the fact-intensive *Qualitex* test and be shown not to have a significant effect on competition in order to receive trademark protection.

---

[15] *See, e.g.*, *Industria Arredamenti Fratelli Saporiti v. Charles Craig, Ltd.*, 725 F.2d 18, 19 (2d Cir. 1984) (interlocking design of couch cushions was a visual "label" but served a utilitarian purpose by keeping cushions in place and was

### i. The Development of the Aesthetic Functionality Doctrine

Although the theory of aesthetic functionality was proposed as early as 1938,[16] the first court to adopt the theory as the basis for denial of protection of a design was the United States Court of Appeals for the Ninth Circuit in *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952). In *Pagliero*, the Court of Appeals determined that the Wallace China Company was not entitled to the exclusive use of a particular floral design on hotel china, despite its "creat[ion of] a substantial market for its products bearing these designs by virtue of extensive advertising." *Id.* at 340. The design, the Court held, was "functional" because it satisfied "a demand for the aesthetic as well as for the utilitarian." *Id.* at 343–44. Because the "particular feature is an *important ingredient* in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright." *Id.* at 343 (emphasis added).

Despite its apparent counterintuitiveness (how can the purely aesthetic be deemed functional, one might ask?), our Court has long accepted the doctrine of aesthetic functionality. *See, e.g.*, *Warner Bros., Inc.*, 724 F.2d at 329–32 (distinctive color and symbols on toy car were not functional, and so were protectable as trade dress).[17] We have rejected, however, the circular "important ingredient" test

---

therefore functional).

[16] In 1938, the Restatement of Torts stated that "[a] feature of goods is functional . . . if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects." Restatement of Torts § 742 (1938). In the official comment to that Section, the Restatement explained several ways in which goods or their features might be functional. With regard to "goods [that] are bought largely for their aesthetic value," the Restatement suggested that "their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended." *Id.* § 742, cmt. a. This was the first time that a commentator had proposed that an aesthetic product feature might be functional. *See* 1 McCarthy on Trademarks § 7:79 (4th ed.).

[17] The doctrine of aesthetic functionality remains controversial in our sister circuits, which have applied the doctrine in varying ways (and some not at all). For example, the Seventh Circuit has applied the doctrine of aesthetic functionality liberally, holding that "[f]ashion is a form of function." *See Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 860

formulated by the *Pagliero* court, which inevitably penalized markholders for their success in promoting their product.[18]  Instead, we have concluded that "Lanham Act protection does not extend to configurations of ornamental features which would *significantly* limit the range of competitive designs available."  *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 (2d Cir. 1991) (emphasis added).  Accordingly, we have held that the doctrine of aesthetic functionality bars protection of a mark that is "necessary to compete in the [relevant] market."  *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.*, 999 F.2d 619, 622 (2d Cir. 1993).

### ii.      A Modern Formulation of the Aesthetic Functionality Doctrine

In 1995, the Supreme Court in *Qualitex* gave its imprimatur to the aesthetic functionality doctrine, holding that "[t]he ultimate test of aesthetic functionality . . . is whether the recognition of trademark rights [in an aesthetic design feature] would significantly hinder competition."  *Qualitex*, 514 U.S. at 170 (quoting Restatement (Third) of Unfair Competition § 17, cmt. c, at 176 (1993)) (internal quotation marks omitted).  Six years later, reiterating its *Qualitex* analysis, the Supreme Court in *TrafFix* declared that where "[a]esthetic functionality [is] the central question," courts must "inquire" as to

---

(7th Cir. 2010).  The Sixth Circuit recently discussed the doctrine, but made clear that it has not yet decided whether or not to adopt it.  *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 417–19 (6th Cir. 2012).  The Ninth Circuit has applied the doctrine inconsistently.  *See* 1 McCarthy on Trademarks § 7:80 (4th ed.) (collecting cases).  The Fifth Circuit rejects the doctrine of aesthetic functionality entirely.  *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 487–88 (5th Cir. 2008) (arguing that the Supreme Court has recognized the aesthetic functionality doctrine only in *dicta*, and that therefore the Fifth Circuit's long-standing rejection of the doctrine was not abrogated by *Qualitex* and *TrafFix*).

[18] *See Wallace Int'l Silversmiths*, 916 F.2d at 80 ("We rejected *Pagliero*['s 'important ingredient' formulation] in [*Le*]*Sportsac* and reiterate that rejection here." (internal citation omitted)); Mark P. McKenna, *(Dys)functionality*, 48 Hous. L. Rev. 823, 851 (2011) ("Courts that apply the aesthetic functionality doctrine today overwhelmingly rely on the test the Supreme Court endorsed in *TrafFix* [rather than the *Pagliero* test], . . . asking whether exclusive use of the claimed feature put competitors at a significant non-reputation-related disadvantage.").

whether recognizing the trademark "would put competitors at a significant non-reputation-related disadvantage." *TrafFix,* 532 U.S. at 32–33.

Although we have not recently had occasion to apply the doctrine of aesthetic functionality thus enunciated by the Supreme Court, it is clear that the combined effect of *Qualitex* and *TrafFix* was to validate the aesthetic functionality doctrine as it had already been developed by this Court in cases including *Wallace International Silversmiths, Stormy Clime*, and *LeSportsac. See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001) (confirming, five months after the *TrafFix* decision, that a putative design trademark is "aesthetic[ally] functional[ ]," and therefore barred from trademark protection, if granting "the right to use [the mark] exclusively 'would put competitors at a significant non-reputation-related disadvantage'" (quoting *TrafFix*, 532 U.S. at 32)).

On the one hand, "'[w]here an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection.'" *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 409–10 (2d Cir. 1997) (quoting *Wallace Int'l Silversmiths, Inc.*, 916 F.2d at 81). But on the other hand, "'distinctive and arbitrary arrangements of predominantly ornamental features that do *not* hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional[,] and [are] hence eligible for [trademark protection].'" *Fabrication Enters., Inc.*, 64 F.3d at 59 (quoting *Stormy Clime*, 809 F.2d at 977) (emphasis added).

In short, a mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark *significantly* undermines competitors' ability to compete in the relevant market. *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir. 1995) (linking aesthetic functionality to availability of alternative designs for children's fall-themed sweaters); *Landscape*

20

*Forms, Inc.*, 70 F.3d at 253 (holding that "in order for a court to find a product design functional, it must first find that certain features of the design are essential to effective competition in a particular market"). In making this determination, courts must carefully weigh "the competitive benefits of protecting the source-identifying aspects" of a mark against the "competitive costs of precluding competitors from using the feature." *Fabrication Enters., Inc.*, 64 F.3d at 59.

Finally, we note that a product feature's successful source indication can sometimes be difficult to distinguish from the feature's aesthetic function, if any. *See, e.g.*, *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010) (noting that "[f]iguring out which designs [produce a benefit other than source identification] can be tricky"). Therefore, in determining whether a mark has an aesthetic function so as to preclude trademark protection, we take care to ensure that the mark's very success in denoting (and promoting) its source does not itself defeat the markholder's right to protect that mark. *See Wallace Int'l Silversmiths, Inc.*, 916 F.2d at 80 (rejecting argument that "the commercial success of an aesthetic feature automatically destroys all of the originator's trademark interest in it, notwithstanding the feature's secondary meaning and the lack of any evidence that competitors cannot develop non-infringing, attractive patterns").

Because aesthetic function and branding success can sometimes be difficult to distinguish, the aesthetic functionality analysis is highly fact-specific. In conducting this inquiry, courts must consider both the markholder's right to enjoy the benefits of its effort to distinguish its product and the public's right to the "vigorously competitive market[ ]" protected by the Lanham Act, which an overly broad trademark might hinder. *Yurman Design, Inc.*, 262 F.3d at 115 (internal quotation mark omitted). In sum, courts must avoid jumping to the conclusion that an aesthetic feature is functional merely because it denotes the product's desirable source. *Cf. Pagliero*, 198 F.2d at 343.

21

### iii.     Aesthetic Functionality in the Fashion Industry

We now turn to the *per se* rule of functionality for color marks in the fashion industry adopted by the District Court—a rule that would effectively deny trademark protection to any deployment of a single color in an item of apparel.  As noted above, the *Qualitex* Court expressly held that "sometimes[ ] a color will meet ordinary legal trademark requirements[, a]nd, when it does so, no special legal rule prevents color alone from serving as a trademark." *Qualitex*, 514 U.S. at 161.  In other words, the Supreme Court specifically forbade the implementation of a *per se* rule that would deny protection for the use of a single color as a trademark in a particular industrial context.  *Qualitex* requires an individualized, fact-based inquiry into the nature of the trademark, and cannot be read to sanction an industry-based *per se* rule.  The District Court created just such a rule, on the theory that "there is something unique about the fashion world that militates against extending trademark protection to a single color." *Louboutin*, 778 F. Supp. 2d at 451.

Even if *Qualitex* could be read to permit an industry-specific *per se* rule of functionality (a reading we think doubtful), such a rule would be neither necessary nor appropriate here.  We readily acknowledge that the fashion industry, like other industries, has special concerns in the operation of trademark law; it has been argued forcefully that United States law does not protect fashion design adequately.[19]  Indeed, the case on appeal is particularly difficult precisely because, as the District Court

---

[19] The intellectual property protection of fashion design has been for years a subject of controversy among commentators.  Some have proposed working within the confines of the current intellectual property system, while others have advocated that fashion design may be an appropriate area for *sui generis* statutory protection. *See generally* C. Scott Hemphill & Jeannie Suk, *The Law, Culture, and Economics of Fashion*, 61 Stan. L. Rev. 1147 (2009); *see also id.* at 1184–90. (Indeed, suggested legislation creating such protection has been considered several times by Congress, although not adopted. *See, e.g.*, Design Piracy Prohibition Act, H.R. 2033, 110th Cong. § 2(c) (2007); Design Piracy Prohibition Act, S. 1957, 110th Cong. § 2(c) (2007).)  Still other commentators have suggested that intellectual property protection of fashion design would be damaging to the industry and should be avoided. *See* Kal Raustiala & Christopher Sprigman, *The Piracy Paradox: Innovation and Intellectual Property in Fashion Design*, 92 Va. L. Rev. 1687, 1775–77 (2006).

well noted, in the fashion industry, color can serve as a tool in the palette of a designer, rather than as mere ornamentation. *Louboutin*, 778 F. Supp. 2d at 452–53.

Nevertheless, the functionality defense does not guarantee a competitor "the greatest range for [his] creative outlet," *id.* at 452–53, but only the ability to fairly compete within a given market.[20] *See Wallace Int'l Silversmiths, Inc.*, 916 F.2d at 81 ("It is a first principle of trademark law that an owner may not use the mark as a means of *excluding* competitors from a . . . market." (emphasis added)). The purpose of the functionality defense "is to prevent advances in functional design from being *monopolized* by the owner of [the mark] . . . in order to encourage competition and the broadest dissemination of useful design features." *Fabrication Enters., Inc.*, 64 F.3d at 58 (internal quotation marks omitted) (emphasis added).

In short, "[b]y focusing upon hindrances to legitimate competition, the [aesthetic] functionality test, carefully applied, can accommodate consumers' somewhat conflicting interests in being assured

---

It is arguable that, in the particular circumstances of this case, the more appropriate vehicle for the protection of the Red Sole Mark would have been copyright rather than trademark. *See generally Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993–94 (2d Cir. 1980) (addressing the broad issue of aesthetically functional copyrights and holding that decorative belt buckles that were used principally for ornamentation could be copyrighted because the primary ornamental aspect of the buckles was conceptually separate from their subsidiary utilitarian function); Laura A. Heymann, *The Trademark/Copyright Divide*, 60 SMU L. Rev. 55 (2007). However, because Louboutin has chosen to rely on the law of trademarks to protect his intellectual property, we necessarily limit our review to that body of law and do not further address the broad and complex issue of fashion design protection.

[20] The trademark system, in this way, stands in sharp contrast to the copyright system. Copyright, unlike trademark, rewards creativity and originality even if they interfere with the rights of an existing copyright holder. In the copyright system there is a defense to infringement known as "independent creation": if a writer or musician, through the creative process, independently arrives at an arrangement of words or notes that is the subject of a copyright, he may market the result of his creativity despite the existing copyright. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991) (requesting that the reader "assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable"); *Procter & Gamble Co. v. Colgate-Palmolive Co.*, 199 F.3d 74, 77–78 (2d Cir. 1999). The trademark system, unlike the copyright system, aims to prevent consumer confusion even at the expense of a manufacturer's creativity: in trademark, if a branding specialist produces a mark that is identical to one already trademarked by another individual or corporation, he must "go back to the drawing board." *See Blendco, Inc. v. Conagra Foods, Inc.*, 132 F. App'x 520, 523 (5th Cir. 2005) (although defendant's allegedly independent creation of infringing mark tended to show that infringement was not willful, defendant remained liable for damages); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227 (E.D.N.Y. 2009) (same).

23

enough product differentiation to avoid confusion as to source and in being afforded the benefits of competition among producers." *Stormy Clime*, 809 F.2d at 978–79.

## IV.    The Red Sole Mark

Having determined that no *per se* rule governs the protection of single-color marks in the fashion industry, any more than it can do so in any other industry, we turn our attention to the Red Sole Mark. As we have explained, Part II.A, *ante*, we analyze a trademark infringement claim in two stages, asking first whether the mark "merits protection" and, second, whether the allegedly infringing use of the mark (or a similar mark) is "likely to cause consumer confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006). The functionality defense (including the tripartite aesthetic functionality test) is an affirmative defense that we consider at the second stage of this analysis. *Stormy Clime, Ltd.*, 809 F.2d at 974.

We have stated the basic rule that "[a] certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*, protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc.*, 192 F.3d at 345. As the District Court correctly noted, "Louboutin's certificate of registration of the Red Sole Mark gives rise to a statutory presumption that the mark is valid."[21] *Louboutin*, 778 F. Supp. 2d at 450 (citing 15 U.S.C. § 1057(b)).[22] But the District Court found, in effect, that YSL had rebutted that

---

[21] Louboutin argues that the District Court disregarded the statutory presumption of validity to which the Red Sole Mark was entitled. We disagree. The District Court's ruling rested at least in part on its determination that the Red Sole Mark is functional and is therefore invalid, and its opinion clearly recognized that, at the threshold of analysis, Louboutin was entitled to the statutory presumption.

[22] We note that a registered trademark that has been in continuous use for at least five years may, in certain circumstances, be deemed "incontestable." 15 U.S.C. § 1065; *see Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 417–18 (6th Cir. 2012). Because the Red Sole Mark has not been in use for five consecutive years since its registration, it is not yet entitled to the special protection available to incontestable marks.

24

presumption by showing that the Red Sole Mark is ineligible for protection because a single color can never achieve trademark protection in the fashion industry. As explained above, that holding was error.

Although, as set forth below, we determine that the Mark as it currently stands is ineligible for protection insofar as it would preclude competitors' use of red outsoles in *all* situations, including the monochromatic use now before us, we conclude that the Mark has acquired secondary meaning—and thus the requisite "distinctness" to merit protection—when used as a red outsole *contrasting* with the remainder of the shoe. Because in this case we determine that the Red Sole Mark merits protection only as modified, and because YSL's use of a red outsole on monochromatic red shoes does not infringe on the Mark as modified, we need not, and do not, reach the issues of customer confusion and functionality at the second stage of the trademark infringement analysis described above.

## A. Distinctiveness

We first address whether the Red Sole Mark "merits protection" as a distinctive mark. As discussed above, distinctiveness may be shown either by proof that the mark is itself inherently distinctive, or by showing that the mark has acquired, through use, secondary meaning in the public eye. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000); *Inwood Labs.*, 456 U.S. at 851 n.11 ("[S]econdary meaning" is acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself"). For the reasons that follow, we hold that the Red Sole Mark has acquired limited secondary meaning as a distinctive symbol that identifies the Louboutin brand, and that it is therefore a valid and protectable mark as modified below. *See PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 559 (2d Cir. 1990) (a mark having secondary meaning is a valid mark).

25

Although a single color, standing alone, can almost never be inherently distinctive because it does not "almost automatically tell a customer that [it] refer[s] to a brand," *Qualitex*, 514 U.S. at 162–63 (emphasis omitted); *see Mana Prods., Inc. v. Colum. Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1070 (2d Cir. 1995), a color as used here is certainly capable of acquiring secondary meaning. As the *Qualitex* Court put it,

> over time, customers may come to treat a particular color on a product or its packaging (say, *a color that in context seems unusual*, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods—*i.e.*, "to indicate" their "source"—much in the way that descriptive words on a product . . . can come to indicate a product's origin.

*Id.* at 163 (emphasis added). In the case of a single-color mark, therefore, distinctiveness must generally be proved by demonstrating that the mark has acquired secondary meaning. *Id.* at 165–66.

We see no reason why a single-color mark in the specific context of the fashion industry could not acquire secondary meaning—and therefore serve as a brand or source identifier—if it is used so consistently and prominently by a particular designer that it becomes a symbol, "the primary significance" of which is "to identify the source of the product rather than the product itself." *Inwood Labs.*, 456 U.S. at 851 n.11; *see also Mana Prods., Inc.*, 65 F.3d at 1071 ("In light of the Supreme Court's decision in *Qualitex*, color is today capable of obtaining trademark status in the same manner that a descriptive mark satisfies the statutory definition of a trademark, by acting as a symbol and attaining secondary meaning.").

"The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source."[23] *Genesee Brewing Co.*, 124 F.3d at 143 n.4.

---

[23] Importantly, to determine whether a mark has secondary meaning, "it is not always the *general* public's understanding but—depending upon the product—often only a segment of consumers that need be examined." *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1985); *see, e.g., Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 n.2 (2d Cir. 1981) (finding that a survey of "500 romance readers in three cities" in which fifty

"Factors that are relevant in determining secondary meaning include '(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use.'" *Id.* (quoting *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1985)). Whether a mark has acquired distinctiveness is "an inherently factual inquiry." *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987). Where, as here, the record contains sufficient undisputed facts to resolve the question of distinctiveness—not to speak of facts found by the District Court that are based upon evidence of record and not clearly erroneous—we may do so as a matter of law. *See id.* at 993–94; *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 333–34 (2d Cir. 1983) (determining, based on the weight of the evidence, that the challenged mark had established secondary meaning).

The record before the District Court included extensive evidence of Louboutin's advertising expenditures, media coverage, and sales success, demonstrating both that Louboutin has created a "symbol" within the meaning of *Qualitex*, *see Qualitex*, 514 U.S. at 162, and that the symbol has gained secondary meaning that causes it to be "uniquely" associated with the Louboutin brand, *see Two Pesos, Inc.*, 505 U.S. at 766 n.4. There is no dispute that Louboutin originated this particular commercial use of the lacquered red color over twenty years ago. As the District Court determined, in findings of fact that are supported by the record and not clearly erroneous, "Louboutin invested substantial amounts of capital building a reputation and good will, as well as promoting and protecting Louboutin's claim to exclusive ownership of the mark as its signature in women's high fashion footwear." *Louboutin*, 778 F. Supp. 2d at 447. And there is no dispute that Louboutin's efforts were successful "to the point where,

---

percent of the respondents identified a certain book cover design as having been produced by a certain publisher was "probative of secondary meaning").

in the high-stakes commercial markets and social circles in which these things matter a great deal, the red outsole became closely associated with Louboutin," *id.* at 447–48 (emphasis added), and where unsolicited media attention to that red sole became rampant. Indeed, the Chief Executive Officer of YSL's parent corporation, François-Henri Pinault, himself acknowledged that, "[i]n the fashion or luxury world, it is absolutely clear that we recognize the notoriety of the distinctive signature constituted by the red sole of LOUBOUTIN models in contrast with the general presentation of the model, particularly its upper, and so for all shades of red."[24] Joint App'x 529.

In light of the evidence in the record, including extensive consumer surveys submitted by both parties during the preliminary injunction proceedings, and of the factual findings of the District Court, we think it plain that Louboutin's marketing efforts have created what the able district judge described as "a . . . brand with worldwide recognition," *Louboutin*, 778 F. Supp. 2d at 448. By placing the color red "in [a] context [that] seems unusual," *Qualitex*, 514 U.S. at 162, and deliberately tying that color to his product, Louboutin has created an identifying mark firmly associated with his brand which, "to those in the know," "instantly" denotes his shoes' source, *Louboutin*, 778 F. Supp. 2d at 448. These findings of fact by the District Court in addressing a motion for a preliminary injunction are not clearly erroneous. We hold that the lacquered red outsole, as applied to a shoe with an "upper"[25] of a different

---

[24] As an example of the interest of plagiarizers in "knocking off" Louboutin's mark—another *Centaur Communications* consideration—we take judicial notice, pursuant to Federal Rule of Evidence 201, of a recent seizure by the United States Bureau of Customs and Border Protection of over 20,000 counterfeit Louboutin shoes illegally shipped to the United States, with an estimated retail value of over $18 million. *CBP Seizes More than 18 Million in Fake Women's Fashion Shoes*, U.S. Dep't of Homeland Sec., Customs & Border Prot. (Thursday, Aug. 16, 2012), http://www.cbp.gov/xp/cgov/newsroom/news_releases/local/08162012_5.xml; *see Ives Labs., Inc. v. Darby Drug Co.*, 638 F.2d 538, 544 n.8 (2d Cir. 1981) (taking judicial notice of existence of official government proceeding), *rev'd on other grounds by Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982).

[25] As noted above, we use the word "upper" to refer to the visible portions of the shoe other than the outsole.

28

color, has "come to identify and distinguish" the Louboutin brand, *Qualitex*, 514 U.S. at 163, and is therefore a distinctive symbol that qualifies for trademark protection.

We further hold that the record fails to demonstrate that the secondary meaning of the Red Sole Mark extends to uses in which the sole *does not* contrast with the upper—in other words, when a red sole is used on a monochromatic red shoe. As the District Court observed, "[w]hen Hollywood starlets cross red carpets and high fashion models strut down runways, and heads turn and eyes drop to the celebrities' feet, lacquered red outsoles on *high-heeled, black shoes* flaunt a glamorous statement that *pops out* at once." *Louboutin*, 778 F. Supp. 2d at 448 (emphasis added)). As clearly suggested by the District Court, it is the *contrast* between the sole and the upper that causes the sole to "pop," and to distinguish its creator.

The evidentiary record further demonstrates that the Louboutin mark is closely associated with contrast. For example, Pinault, the chief executive of YSL's parent company, wrote that the "distinctive signature" of the Mark is in its "contrast with the general presentation of the [shoe], particularly its upper." Joint App'x 529. Of the hundreds of pictures of Louboutin shoes submitted to the District Court, only *four* were monochrome red. *Compare id.* 19, 415, 438, 587 (depicting monochrome Louboutin shoes), *with id.* 415–27, 431–47, 593–653, 680–724 (photographs and news articles depicting Louboutin shoes). And Louboutin's own consumer surveys show that when consumers were shown the YSL monochrome red shoe, of those consumers who misidentified the pictured shoes as Louboutin-made, nearly every one cited the red *sole* of the shoe, rather than its general red color. We conclude, based upon the record before us, that Louboutin has not established secondary meaning in an application of a red sole to a red shoe, but *only* where the red sole contrasts

with the "upper" of the shoe. The use of a red lacquer on the outsole of a red shoe of the same color is not a use of the Red Sole Mark.

Because we conclude that the secondary meaning of the mark held by Louboutin extends only to the use of a lacquered red outsole that contrasts with the adjoining portion of the shoe, we modify the Red Sole Mark, pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119,[26] insofar as it is sought to be applied to any shoe bearing the same color "upper" as the outsole. We therefore instruct the Director of the Patent and Trade Office to limit the registration of the Red Sole Mark to only those situations in which the red lacquered outsole contrasts in color with the adjoining "upper" of the shoe. *See id.*

In sum, we hold that the Red Sole Mark is valid and enforceable as modified. This holding disposes of the Lanham Act claims brought by both Louboutin and YSL because the red sole on YSL's monochrome shoes is neither a use of, nor confusingly similar to, the Red Sole Mark. We therefore affirm the denial of the preliminary injunction insofar as Louboutin could not have shown a likelihood of success on the merits in the absence of an infringing use of the Red Sole Mark by YSL.

### B. Likelihood of Confusion and Functionality

Having limited the Red Sole Mark as described above, and having established that the red sole used by YSL is not a use of the Red Sole Mark, it is axiomatic that we need not—and should not—address either the likelihood of consumer confusion or whether the modified Mark is functional.

---

[26] 15 U.S.C. § 1119 provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, *in whole or in part*, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby." (emphasis added).

30

**CONCLUSION**

To summarize:

We hold that the District Court's conclusion that a single color can never serve as a trademark in the fashion industry was based on an incorrect understanding of the doctrine of aesthetic functionality and was therefore error. We further hold that the District Court's holding, that Louboutin's trademark has developed "secondary meaning" in the public eye, was firmly rooted in the evidence of record and was not clearly erroneous, and that the Red Sole Mark is therefore a valid and enforceable trademark. We limit the Red Sole Mark pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, to a red lacquered outsole that contrasts with the color of the adjoining "upper."

Accordingly, we (1) affirm in part the order of the District Court, insofar as it declined to enjoin the use of a red lacquered outsole as applied to a monochrome red shoe; (2) reverse in part the order of the District Court insofar as it purported to deny trademark protection to Louboutin's use of *contrasting* red lacquered outsoles; and (3) enter judgment accordingly.

We remand for further proceedings with regard to YSL's counterclaims. In the interest of judicial economy, either party may restore jurisdiction to this Court to consider whatever arguments remain or arise relating to this case by sending a letter to the Clerk of this Court within 14 days of the District Court's final judgment. Any such proceedings will be assigned to this panel.

The Clerk of the Court is hereby directed to notify the Director of the United States Patent and Trade Office of this Judgment, which concerns U.S. Trademark Registration No. 3,361,597 held by Christian Louboutin and dated January 1, 2008.